**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**SMITTY HARDING,**

        **Plaintiff,**

**v.**                                              **Civil Action No. 1:16cv173**
                                                    **(Judge Keeley)**

**JIM RUBENSTEIN,** Commissioner of
Corrections**; KAREN PSZCZOLKOWSKI,**
Warden, Northern Correctional Facility**;**
**CECELIA JANISZEWSKI,** Medical
Administrator, Northern Correctional
Facility**; EVELYN SEIFERT,** Warden
Northern Correctional Facility**; JERRY**
**HAHN, M.D.,** Wexford, Northern Correctional
Facility**; ALL WEXFORD EMPLOYEES, JOHN and**
**JANE DOE at Northern Correctional**
**Facility from**
**December 1, 2014 to April 30, 2016; DR. EMIL DAMEF,**
Regional Medical Director at Wexford**; DAVID**
**BALLARD,** Warden Mt. Olive Correctional Center;
**ANNA KINCAID,** Medical Administrator, Mt. Olive
Correctional Complex**; PATRICIA PESHKO,**
Wexford, Mt. Olive Correctional Complex**;**
**SANDRA MAY,** P.A., Wexford, Mt. Olive Correctional
Complex; **DR. SUBASH GAJENDRAGADKAR**,
Wexford, Mt. Olive Correctional Complex;
**NAOMI ROBERTS,** H.S.A., Wexford, Mt. Olive
Correctional Complex**; KATHY DILLON,** A.S.A
to Warden Ballard and Grievance Coordinator at
Mt. Olive Correctional Complex**; RICHARD POLLACK,**
**M.D.,** Wexford, Mt. Olive Correctional Complex**; All**
**WEXFORD EMPLOYEES, JOHN and JANE Doe,**
**at Mt. Olive Correctional Complex from December 1, 2014**
**to April 30, 2016; ALL PRIME CARE MEDICAL INC.**
**EMPLOYEES, JOHN and JANE DOE, at Northern**
**Correctional Facility from December 1, 2014**
**to April 30, 2016; DEBBIE HISSOM,** Healthcare Director,
W.Va. Division of Corrections**,**

        **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

Smitty Harding ("Plaintiff"), an inmate currently incarcerated at St. Marys Correctional Center ("SMCC") in St. Marys, West Virginia, initiated this *pro se* case on August 19, 2016, by filing a civil rights complaint pursuant to 42 U.S.C. §1983 against the above-named defendants. ECF No.1. On August 22, 2016, Plaintiff was granted leave to proceed *in forma pauperis*. ECF No. 8. On October 3, 2016, he paid his required initial partial filing fee. ECF No. 15.  On March 3, 2016, United States Magistrate Judge Michael J. Aloi conducted a preliminary review of the complaint and determined that summary dismissal was not appropriate. ECF No. 26 at 2. Accordingly, an Order to Answer was entered and summonses were issued for the named Defendants other than the John and Jane Does.

On April 7, 2017, David Ballard, Kathy Dillon, Debbie Hissom, Karen Pszczolkowski, Jim Rubenstein, and Evelyn Seifert filed a Motion to Dismiss for Failure to State a Claim. ECF No. 31.  Because Plaintiff is proceeding *pro se,* the Court issued a *Roseboro* Notice on April 10, 2017. ECF No. 33. On April 13, 2017, Emil Damef, Kim Lauder, Patricia Peshko, Rashid and Naomi Roberts filed a Motion for Summary Judgment. ECF No. 36. On April 13, 2017, Emil Damef, Subash Gajendragadkar, Anna Kinkaid, Kim Lauder, Sandra May, Patricia Peshko, Dr. Rashid and Naomi Roberts filed a Motion to Dismiss for Failure to State a Claim. ECF No. 38. A *Roseboro* Notice was issued on April 17, 2017. On May 15, 2017, Jerry Hahn and Cecelia Janiszewski filed a Motion to Dismiss for Failure to State a Claim. ECF No. 50. A *Roseboro* Notice was issued on May 16, 2017. ECF No. 52.   On April 21, 2017, Plaintiff filed his Response to

the Motion to Dismiss filed by Rubenstein, Pszczolkowski, Seifert, Ballard, Dillon and Hissom. ECF No. 43. He has not filed any response to the Motions filed by the other Defendants.

This case is before the undersigned[1] for a Report and Recommendation on Defendants' dispositive motions.

## II. Relevant Facts[2]

Plaintiff is 67 years old and is serving a sentence imposed by the Circuit Court of Raleigh County on December 22, 1987. He entered into the custody of the West Virginia Division of Corrections ("WVDOC") on January 28, 1988. See the offender search application at wvdoc.com. From April 10, 2014, through July 8, 2015, he was housed at the Northern Correctional Facility ("NCF"). From July 8, 2015, through April 29, 2016, he was housed at Mount Olive Correctional Center ("MOCC"). Since April 29, 2016, he has been housed at SMCC.[3]

Plaintiff is a diabetic as noted in his complaint and in medical records attached to the Memorandum of Law in support of the motion to dismiss filed by Defendants Cecelia Janiszewski and Jerry Hahn.  ECF No. 51-1, 51-2. He suffers from peripheral neuropathy.[4] ECF No. 51-1.

---

[1] On September 15, 2017, this matter was reassigned from Magistrate Judge Michael J. Aloi to the undersigned.

[2] Because Plaintiff provides little information in his Complaint, the undersigned believes that the District Judge will find it helpful to have some factual information to review the recommendations contained herein.

[3] This information was obtained from the records department at the Central Office of the WVDOC in an effort to understand Plaintiff's Complaint.

[4] Peripheral neuropathy is a disorder that occurs when the peripheral nerves malfunction because they are damaged or destroyed. This disrupts the nerves' normal functioning. They may send signals of pain when there is nothing causing pain, or they might not send a pain signal even if something is harming the body. Nerve damage caused by diabetes is one of the most common forms of neuropathy. This leads to numbness, pain, and a loss of sensation in the extremities. See www.healthline.com/health/pheripheralneuropathy#causes.

In the first grievance attached to his complaint, he provides more information regarding the history of his injury and his treatment at NCF and MOCC. The first grievance is dated July 13, 2016, and was prepared at SMCC, a little more than two months after he was transferred from MOCC to SMCC. ECF No. 1-1. Plaintiff indicates that on December 7, 2014, he went to take a shower, and when he got in the shower and sat in the metal chair for the handicapped[5], it flipped up in the air and came down on his right big toe. He indicates that the medical care he received was only cream and a band-aid. He further indicates that he was supposed to receive this treatment twice a day, every day until healed, but he only received medical care once a day, every other day.  He also indicates that this treatment went on like that with all the medical staff employed at NCF, until April 7, 2015, when he was sent to see a foot specialist named Dr. Le[6]. Plaintiff indicates that Dr. Le told him he was going to try to save his foot, but he was going to lose his big toe. He indicates that he was sent to Ohio Valley Medical Center, where he was administered numerous tests. He maintains that he was told that his right big toe would have to be amputated because it was filled with gangrene from a lack of treatment. Plaintiff also indicates that he was told by a different foot specialist, Dr. Joseph Goodwin, that he wanted to try him on a Ryback Machine[7] to remove the

---

[5] Plaintiff alleges that at the time of the injury he was a diabetic amputee. Although he provides no further information, the medical records include an entry on October 3, 2014, before the injury to his right great toe, which indicates that he had a prosthetic leg. ECF No. 51-2 at 14.

[6] The Plaintiff refers to Dr. Lee. However, in most of the medical records available to the Court, the podiatrist is referred to as Dr. Le. Accordingly, for the sake of consistency, Dr. Le is used in this Report and Recommendation.

[7] The undersigned believes that Plaintiff is referring to hyperbaric oxygen treatment, or HBOT, which is used to speed up healing of carbon monoxide poisoning, gangrene, stubborn wounds and infections in which tissues are starved for oxygen. It has been approved for more than a dozen conditions ranging from burns to bone disease, including diabetic wounds that are not healing properly. Hopkinsmedicine.org/healthlibrary/conditions/physical_medicine-_and_rehabilitation/hyperbaric_oxygen_therapy_134,147.

infection from the rest of his foot. He indicates he was sent to MOCC and admitted to the medical ward and was to receive two treatments a day until the infection was gone. However, after two weeks of treatment, Plaintiff complains that employees working for Wexford discontinued his treatments due to lack of funds and the cost of treatment. He was then sent to the hospital to undergo surgery on his right foot due to gangrene. He indicates that in July of 2015, he lost the other four toes on his right foot. He remained in the hospital, and shortly thereafter, his right leg was amputated from the knee down. He indicates that he was kept in the hospital until August of 2015. ECF No. 1-1 at 2.

The medical records supplied by Defendants Cecelia Janiszewski, R.N. and Jerry Hahn, M.D., in support of their Motion to Dismiss, establish that Plaintiff was first seen for his toe injury on January 20, 2015, when a mid-level practitioner was called to an interview room to evaluate his injured toe. The toe was edematous. The skin surrounding the nailbed was white and macerated. The top side of the toe had a 1" circular ulcer with a dark center. Plaintiff was assessed to have a diabetic ulcer status post trauma. He was given a tetanus shot, Augmentin 875 twice daily for ten days, and the wound was to be dressed twice daily with Bactrim. ECF No. 51-1.  Plaintiff was seen by Dr. Le, a podiatrist, on January 31, 2015, at NCF. ECF No. 51-2 at 13. On March 4, 2015, a wound culture report was faxed to Dr. Le for review. The report was discussed with Dr. Le and antibiotics were changed to Cipro 500 mg, twice daily for two weeks for appropriate coverage of a new diagnosis of MRSA. ECF No. 51-2 at 7. On March 10, 2016, Plaintiff was transported to Ohio Valley Medical Center for a Doppler test, and the results were faxed to Dr. Le. Id. On March 12, 2015, after reviewing the results, Dr. Le recommended that Plaintiff see a vascular surgeon.  A consult request was completed

5

and submitted. ECF No. 51-2 at 6. On March 19, 2015, medical staff at NCF called the Office of Dr. Khoury, a vascular surgeon, to make an appointment and noted that they were waiting for an answer. Id.

On March 19, 2015, Plaintiff was brought to medical for a dressing change to his right great toe.  The bandage that was removed was saturated in yellowish green drainage with a foul odor. The nail bed was loose and yellow/green in color. Plaintiff assessed his pain as 10/10 on pain scale and described it as a constant throbbing. Dr. Le was called, and he indicated that he would be in that night to take off the toenail. Id. However, later that day, Dr. Le called to say he had the flu and would be in on Saturday[8] at 9:00 a.m. Id. On March 23, 2015, Plaintiff was brought to medical for a dressing change to the right great toe. The medical notes indicate that no toenail was present.51-2 at 5. However, there is no indication from the records whether if fell off spontaneously, or whether Dr. Le had removed it. On April 3, 2015, Plaintiff was seen by Dr. Khoury, who recommended that he have an arterlogram. ECF No. 51-2 at 3.

On April 3, 2015, Plaintiff was brought to medical for a dressing change. The medical note indicates that the old dressing had yellow, brownish drainage with a foul odor present. There was an open ulcer under the toe which was black. The toe itself was yellow and mushy. It was warm and red to the touch. ECF No. 51-2 at 2. On April 4, 2015, the dressing to the right great toe was changed. Plaintiff's toe and foot were noted to be swollen. The toe was red and necrotic with a very foul odor and a small amount of yellow bloody drainage. Id. On April 5, 2015, the dressing was changed to his right great toe. It was again noted to be necrotic with a foul odor. The base of his right foot was

---

[8] In 2015, March 19 was a Thursday, and the undersigned assumes that Dr. Le was indicating that he would be in on the 21st,

red, swollen and hot to touch. The old dressing was removed and contained moderate amount of brownish drainage. Plaintiff stated the pain was unbearable and also stated that he had not eaten in three days. He was offered pain medication as ordered. However, he continued to refuse all medications. Id. On April 10, 2015, the medical notes indicate that Plaintiff arrived back to the facility, status post amputation to his right great toe. Plaintiff denied any pain or discomfort at the time. The dressing on his right foot remained dry and intact. The dressing was to be changed once a day and had been changed earlier that day. Id. The medical notes indicate that Plaintiff remained in the medical unit until at least the following day. Id. The final medical note[9] attached to Defendants' Memorandum is dated April 13, 2015 and indicates that the dressing to his right great toe was changed, and he denied any pain or discomfort. Id.

## II. Contentions of the Parties

### A. The Complaint

Briefly summarized, Plaintiff alleges that he is a diabetic, and between the dates of December 1, 2014, to around April 30, 2016, he was denied proper and adequate medical care which resulted in the amputation of his right leg from the knee down. Plaintiff further alleges that he repeatedly sought medical attention for his foot pain, but the medical staff at the prisons did not timely diagnose or treat the infection. He also alleges that although he was transferred to private hospitals for intravenous antibiotic treatment, the lack of professional medical care delayed effective treatment resulting in gangrene, and the eventual amputation of his lower right leg.

---

[9] According to the memorandum of Defendants Janiszewski and Hahn, they provided care through Prime-Care Medical, Inc., until the company completed its contract at the Northern Regional Jail, and Plaintiff's treatment was resumed by Wexford Health Sources, Inc. ECF No. 51 at 4.  It is unclear to the undersigned whether they continued to provide care to  Plaintiff through Wexford

For relief, Plaintiff requests that the Court award him what damages it feels are due him for the violation of his constitutional rights as well as statutory rights that have resulted in past, present and future pain and suffering. Plaintiff also asks that this action, pursuant to 42 U.S.C. § 1983, be joined with his Federal Tort Claims Act ("FTCA") to further the availability of damages.[10]  Plaintiff also requests that an injunction be issued ordering Wexford Medical Source Inc., or their agents, to fix and/or replace the prosthetic made for his right leg that does not fit properly and immediately arrange for physical therapy or other followup medical treatment with a medical practitioner with expertise in the treatment, restoration and function of a double amputee[11]. Finally, Plaintiff asks to be reimbursed for all filing fees and costs incurred during these proceedings.

**B. Motion to Dismiss by Jim Rubenstein, Karen Pszczolkowski, Evelyn Seifert, David Ballard, Katherine Dillion and Debbie Hissom**

First, these Defendants argue that Evelyn Seifert should be dismissed from this matter because there are no allegations asserted against her in the complaint. With respect to Jim Rubenstein, Karen Pszczolkowski, David Ballard, Katherine Dillion and Debbie Hissom, these Defendants maintain that every single allegation asserted by Plaintiff in his complaint is simply a conclusory legal allegation unsupported by facts.

---

[10] For purposes of clarification, the  undersigned notes that Plaintiff filed a complaint pursuant to the FTCA with this Court on August 19, 2016, the same day he filed this § 1983 action. That case was dismissed on September 23, 2016, because Plaintiff's claims were only against state employees and, thus could not state a claim against the United States under the FTCA. Moreover, because Plaintiff failed to state a claim under the FTCA, this Court did not have subject matter jurisdiction under 28 U.S.C.§ 1331 and could not exercise supplemental jurisdiction over any state law claims. *See* Civil Action No. 5:16cv134.

[11] Again, although Plaintiff's complaint involves medical treatment for an infection in right great toe, and the eventual amputation of his right leg below the knee, the records establish that at the time he first injured his toe, he already had a prosthetic on his left leg.

Defendants maintain that Plaintiff fails to identify the dates of his alleged improper care, the specific or general actions by Defendants that give rise to his alleged injury, and/or how any of these Defendants would know that Plaintiff was allegedly not receiving proper care while in the hands of professionals. Accordingly, these Defendants seek dismissal pursuant to Rule 8 of the Federal and West Virginia Rules of Civil Procedure. In the alternative, pursuant to Rule 12(e) of the Federal Rules of Civil Procedure these Defendants move for a more definite statement that specifies the claims he asserts as to each defendant.

## C. **Plaintiff's Response**

In response, Plaintiff acknowledges that he made no claims against Evelyn Seifert in the body of the complaint and then notes that the claim he makes against her is willful negligence and deliberate indifference to his serious medical needs through willful disregard. In addition, Plaintiff maintains that while the claims he made throughout his complaint appear identical, the "clarity of the claims will become more sharp throughout the Discovery process." ECF No. 43 at 1. Finally, Plaintiff contends that the Defendants are attempting to gain discovery without express leave of the court.

## D. **Motion for Summary Judgment by Emil Damef, Kim Lauder, Patricia Peshko, Dr. Rashid, Naomi Roberts**

These Defendants move the Court for Summary Judgment in their favor and against Plaintiff because none of them worked at either the Northern Correctional Facility ("NCF") or Mount Olive Correctional Center ("MOCC") at any time during the time frame specified by Plaintiff.  In addition, these Defendants allege that they were not involved in Plaintiff's medical treatment during the time period alleged in the complaint.

9

**E. <u>Motion to Dismiss for Failure to State a Claim by Anna Kinkaid, Sandra May and Dr. Subash Gajendragadkar.</u>**

In support of their Motion to Dismiss, these Defendants allege that the Complaint fails to state claim against them upon which relief can be granted because the Complaint contains insufficient factual allegations to support a claim for deliberate indifference, medical malpractice or any other claims of negligence. In addition, these Defendants move the Court to dismiss all claims of medical malpractice asserted by Plaintiff because he failed to comply with the West Virginia Medical Professional Liability Act and to allege the necessary elements of proof as required by West Virginia Code § 55-7B-3.

**F. <u>Motion to Dismiss by Cecelia Janiszewski, R.N. and Jerry Hahn, M.D.</u>**

In support of their Motion to Dismiss, Defendants allege that Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(c). Defendants also allege that Plaintiff's claim must be dismissed because he failed to exhaust his administrative remedies.  In addition, Defendants allege that Plaintiff has failed to comply with the Notice of Claim and Screening Certificate of Merit requirements of the MLPA. Finally, Defendants contend that Plaintiff's claims do not meet the legal threshold for a viable Eight Amendment claim.

### III. <u>Standard of Review</u>

**A.  <u>Motion to Dismiss</u>**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs</u>.,

10

882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss a plaintiff must state a plausible claim in his complaint that is based on cognizant legal authority and includes more than conclusory or speculative factual allegations. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id.; see also Nemet Chevrolet, Ltd. v. Comsumeraffairs.com, Inc., 591 F.3d 250 (4th Cir. 2009). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8 (providing general rules of pleading), Fed. R. Civ. P. 9 (providing rules for pleading special matters), Fed. R. Civ. P. 10 (specifying pleading form), Fed. R. Civ. P. 11 (requiring the signing of a pleading and stating its significance), and Fed. R. Civ. P. 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Plaintiff is proceeding *pro se* and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985). Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30 (1st Cir. 2001)(cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. Specifically, a court may consider official public records, "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice," or sources "whose accuracy cannot reasonably be questioned." Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462 (4th Cir. 2011).

**B. <u>Motion for Summary Judgment</u>**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita</u>, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  <u>Id.</u> This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587.

## IV. <u>Analysis</u>

### A. <u>Deliberate Indifference to Serious Medical Needs</u>

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. <u>Gaudreault v. Municipality of Salem, M</u>ass., 923 F.2d 203, 208 (1st Cir. 1990), <u>cert.denied,</u> 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[12]

---

[12] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. <u>Webb v. Prison Health Services</u>, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. <u>Brice v. Virginia Beach Correctional Center</u>, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. <u>Browning v. Snead</u>, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. <u>Finley v. Trent</u>, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't</u>., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2d Cir. 2000). A prisoner's unresolved dental

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  Wilson, 501 U.S. at 303.  A finding of deliberate indifference requires more than a showing of negligence.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.  A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

---

condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2d Cir. 1998). A degenerative hip is a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, e.g., Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998); Beaman v. Unger, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate, 2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).   A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment,  conditions  which obviously require  medical  attention, conditions  which  significantly affect  an  individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health."  See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing  Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

### 1)  Defendants Jim Rubenstein, Karen Pszczolkowski, Evelyn Seifert, David Ballard, Katherine Dillon, and Debbie Hissom's Motion to Dismiss

Liability under §1983 is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citation omitted).  Therefore, to establish liability under §1983, a plaintiff must specify the acts taken by each defendant which violate his constitutional rights.  See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir. 1988).  Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.  See Zatler v. Wainright, 802 F.2d 397, 401 (11th Cir. 1986).

In his complaint, the Plaintiff makes three broad claims: (1) deliberate Indifference/Negligence, Medical Malpractice/Eighth Amendment-Cruel and Unusual Punishment, done while incarcerated at the Northern Correctional Facility; (2) Deliberate Indifference/Negligence/Medical Malpractice/Eighth Amendment-Cruel and

16

Unusual Punishment, done while incarcerated at the Mount Olive Correctional Complex; and (3) Deliberate Indifference/Negligence/Medical Malpractice/Eighth Amendment-Cruel and Unusual Punishment, done while incarcerated from December 1, 2014, to April 30, 2016.

Plaintiff identifies Jim Rubenstein as the Commissioner of the West Virginia Division of Corrections and lists him as a defendant under all three claims.   He identifies Karen Pszczolkowski as the Warden of the NCF and lists her as defendant under claim one. He identifies Debbie Hissom as the Warden of NCF and lists her as a defendant under Claims one and two. He identifies David Ballard as the Warden of MOCC and lists him as a defendant under claim two. He identifies Kathy Dillon as the assistant to Warden Ballard and the Grievance Coordinator at MOCC and lists her as a defendant under claim three. Finally, in the style of the case, he identifies Evelyn Seifert as the Warden of the NCF,[13] but he does not name her as a Defendant under any of the claims. With respect to each of these Defendants, except Warden Seifert, the Plaintiff indicates that he or she was acting under the authority or color of state law and in his or her individual capacity at the time his claims occurred. In addition, Plaintiff maintains that each had been informed of his medical condition and situation[s] especially when it involved transportation and outside hospital visits. He maintains that each of these Defendants should have verified that proper medical treatment was being administered especially after it took a few visits to the outside hospital.

As a preliminary matter, the Fourth Circuit has held that non-medical supervisory personnel may rely on the opinion of medical staff regarding the proper medical treatment of inmates.  See Miltier, supra at 855. Accordingly, these Defendants did not

---

[13] Ms. Seifert was served at an address other than the NCF.

and should not substitute his or her own medical judgment for that of medical professionals.

Moreover, Plaintiff has not made any credible claims that these Defendants were personally involved in the violation of his constitutional rights. Instead, it appears that Plaintiff names them in their official capacity as Commissioner of the WVDOC, Wardens of NCF, Assistant to Warden of MOCC, and Healthcare Director of the WVDOC. However, official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation and quotations omitted). Therefore, suits against state officials in their official capacities should be treated as suits against the state. Id. at 166. In order for the governmental entity to be a proper party of interest, the entity's policy or custom must have played a part in the violation. Id. (citing Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 694 (1978)).

There is no *respondeat superior* liability under §1983. See Monell, 436 U.S. at 691; see also Vinnedge v. Gibbs, 550 F. 2d 926, 928 (4th Cir. 1997). Instead, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge, *supra.* Nonetheless, when a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v. Washington Metropolitan Area Transit Authority, 690 F. 2d 1113 (4th Cir. 1982). Similarly, a supervisor may be liable under §1983 if the following elements are established:

> (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and

unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 813 (1994).[14]

With respect to Rubenstein, Pszczolkowski, Hissom, Dillon and Ballard, Plaintiff's complaint, in its most detailed sense, alleges that:

> [He/she] has a Moral and Legal Duty to use Due Care, Professionally and Personally, acting in both, with the oversight of the Plaintiff and his many Medical Conditions, (i.e. A Diabetic Amputee), failed to properly protect and ensure the Plaintiff['s] constitutional rights are not breached and violated. This Defendant was fully aware of the Medical condition and the pain and Suffering the Plaintiff was going through with his injury to his right foot and a lack of Professional Medical Treatment that the West Virginia Division of Corrections has subcontracted through both Prime Care Medical Inc. and Wexford Health Sources incorporated by means of approval of Transportation to and from the outside hospital[s], Transportation to and from Northern Correctional Facility and Mount Olive Correctional Complex, cost of surgery[s], and expensive Medical Treatment[s] to remove the gangrene in his right leg and foot. This Defendant should have realized immediately that there was a Breach in the Due Care from the severe complication with gangrene and the inability of the Prime Care and Wexford Employees to treat and remove the gangrene.

 See, for example, ECF No. 1 at 17.

Regardless of Plaintiff's insistence that these Defendants had a personal duty to ensure adequate care, the case law in this jurisdiction is that non-medical supervisory personnel are entitled to rely on the opinion of medical staff regarding the proper medical treatment of inmates. See Militier, supra at 855. Accordingly, these Defendants

---

[14] "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Shaw, 13 F.3d at 799. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id.

were entitled to rely on the medical staff's decisions regarding Plaintiff's care. Further, to the extent that Plaintiff is asserting that these Defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is without merit because that is not the type of personal involvement required to state a claim under 442 U.S.C. § 1983.  See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

Because Plaintiff fails to allege any credible personal involvement on the part of any of these Defendants, he does not make any allegations which reveal the presence of the required elements for supervisory liability and he fails to state a claim against them. According, their Motion to Dismiss should be granted.

2) **MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DAMEF, PESHKO, RASHI, LAUDER AND ROBERTS**

As identified by Plaintiff, these Defendants were employed by Wexford Health Sources at MOCC and were acting under the authority or color of state law and in his or her individual capacity at the time his claims occurred. These Defendants have filed a Motion for Summary Judgment contending that there is no genuine issue as to any material fact because none of them were employed at or providing services at either the NCF or MOCC while Plaintiff was an inmate there. In support of their motion, these Defendants have supplied the Affidavit of Joe Ebbitt, who is employed by Wexford Health Sources, Inc. as the Director of Risk Management, HIPPA Compliance, and Legal Affairs. ECF No. 39-1 at 1.

With respect to these defendants, Mr. Ebbitt's affidavit establishes the following:

1. Dr. Damef was employed by Wexford in various capacities from July 6, 2001 until March 21, 2016. However, Dr. Damef did not perform work related to West Virginia since prior to December 2014.

2.  Ms. Peshko was employed by Wexford Health as an RN at MOCC from December 10, 2008 until April 4, 2011. Ms. Peshko was not thereafter employed by Wexford in any capacity at any location.

3.  Humayum Rashid, MD was employed by Wexford as Medical Director at MOCC from September 1, 2010, until February 15, 2012. Dr. Rashid was not thereafter employed by Wexford in any capacity at any location.

4.  Kim Lauder, MD was employed by Wexford as West Virginia Regional Medical Director from January 24, 2009 to August 21, 2010. Dr. Lauder was not thereafter employed by Wexford in any capacity at any location.

5.  Naomi Roberts, RN was employed by Wexford as an RN/DON/HAS at MOCC from August 31, 2008, until August 3, 2010, and was not thereafter employed by Wexford in any capacity at any location.

6.  Wexford never employed Richard Pollack[15]

7.  Wexford has been the healthcare provider at MOCC since May 1, 2008, and at Northern Regional Jail and Correctional Facility since March 1, 2015.

As noted by these Defendants, the Plaintiff's allegations begin when he injured his toe on December 7, 2014, and end with his transfer to SMCC at the end of April 2016. Therefore to have any involvement in the allegations regarding his medical care, a Defendant would have had to be employed at NCF or MOCC, or performed services at those facilities, or participated in Plaintiff's medical care between December 2014, and April 2016. However, as demonstrated by the affidavit of Joe Ebbitt, it is undisputed that these Defendants were not employed by Wexford at the times alleged in the

---

[15] Although Dr. Pollack was never served [ECF No. 61], it is clear that he could not have been employed at MOCC by Wexford as alleged by Plaintiff. ECF No. 1 at 9-10.

complaint or, in the case of Dr. Damef, performed no services in the State of West Virginia during that time frame.[16]  As such, there is no genuine issue as to any material facts with respect to these five Defendants, and they are entitled to summary judgment in their favor as a matter of law.

3)  **Motion to Dismiss by Wexford Medical  Defendants Kinkaid, May and Gajendragadkar**

According to Plaintiff's complaint, Anna Kinkaid is the Medical Administrator at MOCC. ECF No. 1 at 5. He identifies Sandra May as a Physician Assistant at MOCC. Id. at 6. Finally, although he does not specify whether he is an allopathic (MD) or osteopathic (DO) physician, Plaintiff identifies Subash Gajendragadkar as a doctor at MOCC. Id. at 7. All three of the Defendants are named in Count 2 of the Plaintiff's complaint and with respect to each, Plaintiff states:

> …has a Moral and Legal Duty to use Due Care, Professionally and personally and was acting in both, with the oversight of the Plaintiff and his many Medical Conditions (i.e.  A Diabetic Amputee), failed to properly protect and ensure the Plaintiff's Constitutional Right[s] are not breached and violated. This Defendant was fully aware of the Medical Condition and the Pain and Suffering the Plaintiff was going through with his injury to his right foot and the lack of professional Medical Treatment that the West Virginia Division of Corrections has subcontracted  through Wexford Health Sources, Inc., by means of approval of Transportation to and from the outside hospital[s], Transportation to and from Northern Correctional Facility and Mt. Olive Correctional Complex, cost of surgery(s), and expensive Medical Treatment[s] to remove the gangrene in his right leg and foot. This Defendant should have realized immediately that there was a Breach in the Due Care from the severe complications with gangrene and the inability of the Wexford Employees to treat and remove the gangrene.

---

[16] As previously noted, Plaintiff entered into the custody of the WVDOC on January 28, 1988, when the West Virginia State Penitentiary was located in Moundsville, West Virginia.  It is clear that each of these Defendants was employed by Wexford during the course of his incarceration, and the undersigned can only surmise that he has confused these individuals and the dates that he may have come into contact with them.

ECF No. 1 at 19, 20, 21.

In reviewing Plaintiff's complaint with respect to these three Defendants, it is pertinent to note that he was housed at MOCC from July 8, 2015, through July 29, 2016. By his own admission, he was admitted to "the hospital" two weeks after arriving at MOCC. It is clear, therefore, that all of his medical care from the time he was injured in December of 2014, until July 8, 2015, took place at NCF or through private doctors and hospitals to whom NCF medical personal referred him. Aside from a boilerplate assertion that appears to imply that treatment with the "Ryback machine" was discontinued because of cost considerations, Plaintiff provides nothing to support a claim of deliberate indifference by these three Defendants in the two weeks between when he arrived a MOCC and when he was sent to an outside hospital, where a series of amputations ultimately end with the loss of his leg below the knee. Accordingly, given even the most liberal interpretation of the complaint, Plaintiff fails to state a claim of deliberate indifference[17] against these Defendants, and their Motion to Dismiss should be granted.

4) **Motion to Dismiss by Cecelia Janiszewski, R.N. and Jerry Hahn, M.D.**

These Defendants set forth multiple grounds for dismissal, including failure to exhaust administrative grievances, failure to state a claim that is plausible on its face, and failure to comply with the Notice of Claim and Screening Certificate of Merit required of the Medical Professional Liability Act ("MPLA"). Although the undersigned disagrees with these Defendants on their argument regarding exhaustion of administrative grievances, their other two arguments are persuasive.

---

[17]As discussed *infra*, to the extent Plaintiff's complaint against any of the medical Defendants attempts to raise a claim of negligence, he has failed to satisfy the requirements for bringing a medical negligence claim in West Virginia.

Turning first to the allegation that the Plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies, the undersigned acknowledges that the under the Prison Litigation Reform Act (PLRA)[18], a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies.  42 U.S.C. § 1997(e)(a). These Defendants then set forth the procedures for exhaustion as they apply to the West Virginia Regional Jail and Correctional Facility. However, the records indicate that the Plaintiff was housed at the Northern Correctional Facility, which is a facility operated by the West Virginia Department of Corrections.[19] The WVDOC has established a three level grievance process for prisoners to grieve their complaints in an attempt to resolve the prisoners' issues.  The first level involves filing a G-1 Grievance Form with the Unit Supervisor.  If the inmate receives no response or is unsatisfied with the response received at Level One, the inmate may proceed to Level Two by filing a G-2 Grievance Form with the warden/administrator.  Finally, the inmate may appeal the Level 2 decision to the Commissioner of the Division of Corrections.

Moreover, exhaustion of administrative grievances is an affirmative defense, and the Plaintiff is required neither to plead exhaustion nor prove it in his complaint. Here, the Plaintiff alleges that he filed grievances, but he lost them in the process of surgeries at the hospital along with all his other belongings. ECF No. 1 at 11-25. One would assume that these Defendants could have secured an affidavit from an appropriate

---

[18] For reasons that are unclear to the undersigned, these Defendants cite to the West Virginia Prison Litigation Reform Act, West Virginia Code  § 25-1a-2.

[19]According to the WVDOC website, "[t]he Northern Regional Jail and Correctional facility…is 'unique' in the aspect that it is two separate and distinct entities, a Correctional Facility under the direction of the West Virginia Division of Corrections and a  Regional Jail under the direction of the Regional Jail authority."

individual at the central office to establish that the Plaintiff did not file any grievances while he was incarcerated at the NCF. In addition, the Plaintiff did initiate a grievance at SMCC on July 7, 2016, which indicated that the issue to be addressed was a continuing tort. ECF No. 1-1 at 1- 2. He filed a second grievance at SMCC on July 21, 2016, which complains about a continuing disregard for his severe medical need. Id. at 1-2 at 1-2. Although Defendants acknowledge these two grievances, they argue that there was insufficient time for those grievances to be exhausted before the complaint was filed on August 9, 2016. However, both grievances are not only attached as exhibits to the complaint, they are each stamped "AFFIRMED Grievance Denied Central Office Grievance Review" which denotes that the grievance was denied by the Commissioner, and the administrative remedy process was completed. Accordingly, the undersigned finds that it would be inappropriate to dismiss the Plaintiff's complaint for failure to exhaust his administrative grievances.

These Defendants also argue that the Plaintiff's complaint is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Plaintiff identifies Cecelia Janiszewski as the Medical Administrator at the Northern Correctional Facility. She identifies Jerry Hahn, M.D., as the doctor for Wexford at the Northern Correctional Facility. He specifically names both of these Defendants under Claim One and states that each:

> has a Moral and Legal Duty to use Due Care, Professionally and personally and was acting in both, with the oversight of the Plaintiff in his many Medical Conditions (i.e. A Diabetic Amputee), failed to properly protect and ensure the Plaintiff's Constitutional Rights are not breached and violated. This Defendant was fully aware of the Medical Condition and the Pain and Suffering the Plaintiff was going through with his injury to his right foot and the lack of Professional Medical Treatment that the West Virginia Division of Corrections has subcontracted through Wexford Health

25

> Sources incorporated by means of approval of Transportation to and from
> hospital[s], cost of surgery[s], and expensive Medical Treatments to
> remove the gangrene in his right leg and foot. This Defendant should have
> realized immediately that there was a Breach in the Due Care from the
> severe complication with gangrene and the inability of the PrimeCare and
> Wexford Employees to treat and remove the gangrene.

ECF No. 1 at 15. Aside from this one paragraph, Plaintiff makes no further
mention of either of these Defendants.

Accordingly, these Defendants allege that Plaintiff's complaint does not
contain enough facts to state a claim for relief that is plausible on its face. More
specifically, these Defendants argue that the complaint does not allege any
factual allegations to support a claim for a deprivation of Plaintiff's constitutional
rights, nor does it allege any specific conduct on the part of either that meets the
much lower threshold to support a claim of medical malpractice.  Therefore, they
move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) because the complaint
contains "only the legal conclusion that the defendant is liable to the Plaintiff for
damages arising from his injury that was appropriately evaluated and treated."
ECF No. 51 at 6.

As previously noted in this Report and Recommendation, to survive a motion to
dismiss a plaintiff must state a plausible claim in his complaint that is based on
cognizable legal authority and include more than conclusory or speculative allegations.
In the instant case, the Plaintiff has stated one identical conclusory paragraph as to
each of these Defendants without providing any supporting facts whatsoever. Moreover,
although Plaintiff attached grievances, there is no reference to either Defendant, and
again there are insufficient facts included in those grievances to indicate that either
Defendant was directly involved in his care. Therefore, because the complaint contains

26

only the legal conclusion that these Defendants are liable to him for damages arising from what the undersigned construes as a claim for deliberate indifference, their Motion to Dismiss should be granted.

Finally, to extent that the Plaintiff is attempting to make a claim of negligence, the Defendants are again entitled to dismissal. To pursue a medical negligence claim, the Plaintiff must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required.  Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (W.Va. 2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued.  W.Va. Code §55-7B-6.    This section provides in pertinent part:

> **§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) *At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim* on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of

27

action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, *together with a screening certificate of merit*. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

W.Va. Code §55-7B-6 (emphasis added).

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).[20] Because Plaintiff has not complied with W.Va. Code § 55-7B-6, any attempt to raise a negligence claim must be dismissed.

## V. Recommendation

For the reasons stated above, the undersigned hereby recommends that Defendants' Motions to Dismiss [ECF Nos. 31, 38 and 50] be **GRANTED**; Defendants' Motion for Summary Judgment [ECF No. 36] be **GRANTED** and Plaintiff's complaint be **DENIED and DISMISSED with prejudice, for failure to state a claim upon which relief can be granted**.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections

---

[20] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**. 28 U.S.C. §636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

Upon entry of this Report and Recommendation, the Clerk of Court is **DIRECTED** to terminate the Magistrate Judge Association with this case. The Clerk is further **DIRECTED** to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: February 1, 2018

*/s/ James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE

29